HESTON & HESTON
Benjamin R. Heston (SBN 297798)
Halli B. Heston (SBN 90737)
Richard G. Heston (SBN 90738)
19700 Fairchild Road, Suite 280
Irvine, California 92612-2521
Tel: (951) 290-2827
Fax: (949) 222-1043
ben@hestonlaw.com

Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>LINDA K. MEINBERG,<br><br>             Debtor. | Case No.: 6:22-bk-11532-WJ<br><br>Chapter 7<br><br>**REPLY TO OPPOSITION TO MOTION TO AVOID LIEN**<br><br><u>Hearing</u><br>Date: July 26, 2022<br>Time: 1:00 p.m.<br>Courtroom 304<br>3420 Twelfth Street<br>Riverside, CA 92501 |

Debtor, Linda K. Meinberg, hereby submits this reply to Respondent's Opposition to Debtor's Motion to Avoid Lien, and alleges as follows:

## I.

## DUE TO RESPONDENT'S FAILURE TO OBJECT TO DEBTOR'S

## CLAIMED HOMESTEAD EXEMPTIONS PRIOR TO THE DEADLINE TO DO SO,

## THE HOMESTEAD EXEMPTION BECAME FINAL ON JULY 6, 2022

Federal Rule of Bankruptcy Procedure 4003(b)(1) provides as follows:

Except as provided in paragraphs (2) and (3), a party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under §341(a) is concluded or within 30 days after any amendment

to the list or supplemental schedules is filed, whichever is later. The court may, for cause, extend the time for filing objections if, before the time to object expires, a party in interest files a request for an extension.

Fed. R. Bankr. P. 4003.

These deadlines are not just buried in the Federal Rules of Bankruptcy Procedure, but they are also clearly laid out in large, bold font in the notice that the Court sent to creditors immediately after the case was filed:

> **"Deadlines**
>
> The bankruptcy clerk's office must receive these documents and any required filing fee by the following deadlines.
>
> **Deadline to object to exemptions:**
>
> The law permits debtors to keep certain property as exempt. If you believe that the law does not authorize an exemption claimed, you may file an objection.
>
> **Filing deadline:**
>
> 30 days after the *conclusion* of the meeting of creditors."

See Docket #5, Notice of Chapter 7 Bankruptcy Case, filed April 26, 2022.

Here, the §341(a) Meeting of Creditors was held and concluded on June 2, 2022. Accordingly, the deadline to file an objection to Debtor's claimed exemptions was July 5, 2022.[1]

Rather than follow the proper procedures for objecting to Debtor's exemptions, the Opposition to the Motion to Avoid Lien states in a conclusory fashion that they have objected to the homestead exemption and have done so within the 30-day period.

Courts are split on whether the filing of a motion to avoid lien effectively extends the period for objecting to exemptions. Some courts take the view that FRBP 4003(c) is clear on its face and that if an exemption is not objected to within that 30-day period, it is deemed final. Other courts take the view that a lien avoidance motion presents a unique problem since secured creditors would be unaffected by the Chapter 7 discharge absent the avoidance of their lien and,

---

[1] 30 days after the §341(a) hearing was July 2, 2022, which was the Saturday prior to the July 4th national holiday.

therefore, the need to file such an objection is not known until the lien avoidance motion is filed.

In the United State Supreme Court case <u>Taylor v. Freeland Kronz</u>, 503 U.S. 638, 644 (1992), the court held that the 30-day deadline is an absolute requirement and that failure to object by the deadline renders an exemption final, even if there was no colorable basis to claim the exemption:

> Deadlines may lead to unwelcome results, but they prompt parties to act, and they produce finality. In this case, despite what respondents repeatedly told him, Taylor did not object to the claimed exemption. If Taylor did not know the value of the potential proceeds of the lawsuit, he could have sought a hearing on the issue, see Rule 4003(c), or he could have asked the Bankruptcy Court for an extension of time to object, see Rule 4003(b). Having done neither, Taylor cannot now seek to deprive Davis and respondents of the exemption.

<u>Taylor v. Freeland Kronz</u>, 503 U.S. 638, 644 (1992).

The case <u>In re Patterson</u>, 275 B.R. 578 (Bankr. D. Colo. 2002) provides a very clear explanation of the other differing views:

> The courts are split on whether the failure to timely object precludes a lien creditor from asserting an objection to the exemption in defense of a lien avoidance motion. The Tenth Circuit has not ruled on this issue. One line of authority, which precludes the untimely attack on the exemption, is represented by <u>In re Chinosorn</u>, 248 B.R. 324 (U.S.D.C. N.D. Ill. 2000). The <u>Chinosorn</u> court relied on <u>Taylor</u>'s strict enforcement of the thirty day deadline, "even if the debtor did not have a colorable basis for claiming the exemption." <u>Id.</u> at 326. The <u>Chinosorn</u> court believed it was bound by <u>Taylor</u>'s ruling that "[d]eadlines may lead to unwelcome results, but they prompt parties to act and they produce finality." Id. at 327 (quoting <u>Taylor v. Freeland Kronz</u>, 503 U.S. at 644). See <u>In re Shirel</u>, 251 B.R. 157 (Bankr.W.D.Okla. 2000); <u>In re Kazi</u>, 985 F.2d 318 (7th Cir. 1993).
>
> Other courts have held that entitlement to an exemption and entitlement to avoid a lien on claimed exempt property involve separate questions. In <u>In re Thompson</u>, 263 B.R. 134 (Bankr.W.D.Okla. 2001), the court held that the secured creditor's failure to timely object did not preclude it from litigating the merits of the exemption in the context of defending a lien avoidance action. The <u>Thompson</u> court noted several different bases on which other courts have ruled similarly. Id. at 136-37. Some courts have pointed to the language in 11 U.S.C. § 522(f) ("Section 522(f)") of "would have been entitled" to the exemption as indicative of congressional intent to allow consideration of the validity of the exemption in the context of a lien avoidance action and as indicating that the statute does not automatically allow avoidance, merely because the exemption was established by default under Section 522(l). <u>In re Mohring</u>, 142 B.R. 389, 394 (Bankr.E.D.Cal. 1992). Other courts reach the same result, but focus on the definition of "impairment" under Section 522(f). In <u>In re Moe</u>, 179 B.R. 654 (Bankr.D.Mont. 1995), the court "held that such definition specifically requires the court to include the amount of the exemption that the debtor could claim, as opposed to actually claimed and allowed by default, if there were no liens on the property." <u>In re Thompson</u>, 263 B.R. at 137. Another school of thought finds that Sections 522(f)

and (l) serve different functions. "Exemption under § 522(l) quickly determines which property is available for distribution . . . to unsecured creditors and which property is available for the `fresh start' of the debtor. In contrast, § 522(f) extinguishes the property rights of a creditor." In re Thompson, 263 B.R. at 137 (quoting In re Streeper, 158 B.R. 783, 787 (Bankr.N.D.Iowa 1993)).

Some courts have reasoned that requiring a secured creditor to object to the exemptions when they are first claimed, when it does not know if the debtor will ever challenge its lien rights, will lead to "unnecessary litigation and may hinder the debtor's fresh start." In re Morgan, 149 B.R. 147, 152 (9th Cir. B.A.P. 1993). In addition, it upsets the settled expectations of secured creditors that they have the option of not participating in the bankruptcy, even to the point of not filing a proof of claim, because of the general rule that their lien rights will survive the bankruptcy unaffected. In re Thompson, 263 B.R. at 137. Most importantly, denying the lien creditor its defense would be tantamount to a denial of due process. The Clerk's Notice that informs all creditors of the bankruptcy filing and of the deadline for objections to exemptions does not specify the exemptions nor does it advise creditors at all about the possibility of lien avoidance motions. "`At a minimum, due process should require that the lien creditor receive notice (rather than be required to search for it) that the liened property is claimed as exempt before the time to object has expired.' . . . Allowing the debtor to rely upon the exemption-by-default of § 522(l) to avoid a secured creditor's lien would amount to a procedural ambush not sanctioned by the Constitution." In re Morgan, 149 B.R. at 152 (quoting In re Smith, 119 B.R. 757, 760 (Bankr.E.D.Cal. 1990)).

In re Patterson, 275 B.R. 578, 582-84 (Bankr. D. Colo. 2002)

Here, none of the potential "gamesmanship" factors are present. This case was commenced on April 26, 2022 by Debtor filing a Voluntary Chapter 7 Petition. Attached to the Petition, Debtor filed a Schedule C which states that she is claiming a homestead exemption in the amount of $580,000 pursuant to California Code of Civil Procedure §704.730. Also attached to the Petition, Debtor filed a Statement of Intention with respect to Respondent's lien which states that Debtor intends to "avoid lien using 11 U.S.C. §522(f)". On April 30, 2022, four days after the case was commenced, Counsel for the Debtor sent an email to Counsel for Respondent which stated: "We plan on filing the motion to avoid lien asap, possibly Monday." Debtor thereafter delayed filing the Motion in order to allow Respondent to conduct an appraisal of the Property without being forced to do so on an emergency basis. As such, Respondent had plenty of notice of the Debtor's claimed exemption, her intent to avoid the lien, and the strict 30-day deadline to file an objection. There is no reason why it would be excusable to cut corners and not comply with the simple procedures clearly laid out in the applicable rules.

## II.

### THE OPPOSITION STATES AN EXEMPTION AMOUNT THAT IS INCONSISTENT WITH THE DEFINITION OF SET FORTH IN C.C.P. §704.730

Pursuant to California Code of Civil Procedure §704.730, the homestead exemption in a given county is equal to the median sale price of a single-family homes sold in the county during the prior year. The amounts are subject to lower and upper caps of $300,000 and $600,000, annually adjusted for inflation. In 2022, these caps were adjusted by 4.4% based on the California Consumer Price Index, and are now $313,200 and $626,400. In some of the more expensive markets in California, it can be very reasonably assumed that the applicable homestead exemption is equal to the higher-end cap: $626,400. However, things get very tricky when you are looking at counties where the median sale price is likely *between* the lower- and higher-end caps, which almost certainly includes Riverside County.

In Riverside County, the homestead exemption for 2022 is equal to the countywide median sale price for single-family homes sold in 2021. Based on this definition, the sales that are included in this dataset are limited by only two qualifiers: 1) the sale must have occurred in 2021; and 2) it must be a single-family home. If this data could be collected, the median sale price would be determined by sorting these sales into a list that is ascending or descending based on the sale price, and then simply picking the middle sale or, for an even numbered dataset, the mid-point between the two middle sales. Simply put, it is mathematically impossible to calculate the median without knowing the sale price of <u>every single home</u> that was sold within the county.

According to the National Association of Realtors, multiple listing services (hereinafter, "MLS") are: "…private databases that are created, maintained and paid for by real estate professionals to help their clients buy and sell property."[2] Essentially, an MLS is a privately run marketing tool which allow for a seller to easily advertise their home to a very large audience consisting of any agent that is subscribed to the MLS and, nowadays, anyone that has access to

---

[2] "Multiple Listing Service (MLS): What Is It." *www.nar.realtor*, National Association of Realtors, 7 Feb. 2018, https://www.nar.realtor/nar-doj-settlement/multiple-listing-service-mls-what-is-it.

websites like Zillow, RedFin, Trulia, etc. The MLS system is highly efficient and can result in homes being sold within hours of being listed. As such, most homes are sold through an MLS. However, some sellers prefer to not advertise their homes on an MLS. Homes that are not sold on an MLS are referred to as "off-market" or "pocket" sales. Without the assistance of an MLS, advertising these sales usually comes down to "word of mouth". For most people, this would be an absurd way to market a property given that the MLS advertises to the entire world, whereas word of mouth might limit the potential buyer pool to just the extended social circle of the buyer's real estate agent. However, off-market sales are attractive to some for a variety of reasons, including "creating an air of exclusivity", personal privacy concerns (MLS listings usually entail publishing interior/exterior pictures, asking and sale prices, recorded document history, they can attract theft and vandalism, and so on), more targeted advertising of "unique" properties, costs savings (pocket listings are more likely to be handled on a "dual agency" basis which in some circumstances can increase the real estate agent's commission, but lower the total commission), and, unfortunately, it enables racial and socio-economic discrimination. Despite attempts by National Association of Realtors, regional realtor associations, and legislators to ban the practice, these off-market sales have been on the rise for many years and has accelerated due to the unique conditions of the post-Covid housing market.[3, 4] For instance, a recent study by Redfin found that in the 3rd quarter of 2021, approximately 13.1% of the homes sold in the city of Riverside were never listed on an MLS.[5] These off-market listings are more common for the

---

[3] Vinopal, Courtney. "Houses Are Getting Scooped up before They're Listed. It's Shutting People out of Homeownership." *PBS*, Public Broadcasting Service, 11 Aug. 2021, https://www.pbs.org/newshour/economy/houses-are-getting-scooped-up-before-theyre-listed-its-shutting-people-out-of-homeownership.

[4] Olya, Gabrielle. "Why You Need to Know about 'Pocket Listings' in an Increasingly Competitive Real Estate Market." *Yahoo! News*, Yahoo!, 29 June 2021, https://www.yahoo.com/video/why-know-pocket-listings-increasingly-150047171.html.

[5] Katz, Lily. "2 In 5 Real Estate Agents Say Pocket Listings Are Becoming More Common." *Redfin Real Estate News*, Redfin, 8 Dec. 2021, https://www.redfin.com/news/real-estate-pocket-listings-q3-2021/. `

higher end of the market, luxury homes, and other unique properties.[6, 7] Given the obscure nature of off-market sales, it is nearly impossible to get exact figures, let alone every single sale price.

According to the Opposition, the figure of $560,000 "*was generated based on sales transactions extracted from data collected from more than 90 associations/multiple listing services in the state of California.*" See Declaration of Oscar Wei, p. 2. The Declaration also states that the "raw data" (i.e., each individual sale) cannot be produced since it is subject to confidentiality agreements with various MLSs (to reiterate, these MLSs are "private databases that are created, maintained and paid for by real estate professionals to help their clients buy and sell property"). Mr. Wei gives no indication of what procedures the individual MLSs took to gather, preserve, and transmit this data to C.A.R, or whether he is even personally aware of any facts that would guarantee the veracity of the raw data. Without any further elaboration, the Court simply cannot determine whether Mr. Wei's testimony is the product of sufficient data (as discussed *supra*, it is not) and whether reliable principles were reliably applied to such data. See Fed. R. Evid. 702.

Evidentiary issues aside, not only does the dataset used by Respondent not include a large portion of the sales that should be included pursuant to C.C.P. §704.730, but the dataset being excluded is more likely to consist of sales that were on the higher end of sale prices. Therefore, the $560,000 figure given by Respondent is not only incorrect, but it is very likely to be <u>less than</u> the actual 2021 yearly median.


### III.

### IN THE CONTEXT OF AN OBJECTION TO A DEBTOR'S CLAIMED EXEMPTION, FEDERAL RULE OF BANKRUPTCY PROCEDURE 4003(c) PROVIDES THAT THE

---

[6] Lloyd, Alcynna. "New York Elites Are Snatching up Luxury Real Estate Using a Method That's Against Many Realtors' Code of Ethics." *Business Insider*, Business Insider, 1 Mar. 2022, https://www.businessinsider.com/new-yorkers-buying-luxury-real-estate-off-market-2022-3.

[7] Paris, Ellen. "Why Ultra-Luxury Real Estate Agents, Sellers and Buyers Love Off-Market Listings." *Forbes*, Forbes Magazine, 30 July 2019, https://www.forbes.com/sites/ellenparis/2019/07/30/the-advantages-off-market-real-estate-listings-give-buyers-sellers-and-agents/.

**OBJECTING PARTY CARRIES THE BURDEN TO SHOW THAT THE OBJECTION**

**IS NOT PROPERLY CLAIMED. RESPONDENT HAS NOT MET THIS BURDEN.**

In a decision from March 2022 authored by the Honorable Mark D. Houle, In re Hammond, 6:17-bk-18617-MH (Bankr. C.D. Cal. Mar. 16, 2022), the court grappled with the fact that the California Code of Civil Procedure §704.780 proscribes burdens of proof that can be inconsistent with Federal Rule of Bankruptcy Procedure. FRBP 4003(c) states: "In any hearing under this rule, **the objecting party has the burden of proving that the exemptions are not properly claimed**…" Fed. R. Bankr. P. 4003 (emphasis added). However, the Code of Civil Procedure shifts the burdens depending on whether there is a declared homestead on record, and it also splits the issue into two sub-parts: proof that the dwelling is a homestead, and the amount of the exemption.[8] The court came to the conclusion that FRBP 4003(c) prevails over state law and that the burden lies with the objection party to show that the exemption was improperly claimed:

> While the Court does not conclude that the approach represented by In re Nicholson is the better-reasoned approach, for multiple reasons outlined below, the Court concludes that Fed.R.Bankr.P. Rule 4003(c) remains valid.
>
> First, the Supreme Court approves the Federal Rules of Bankruptcy Procedure. Raleigh was decided in 2000, so the Supreme Court has had twenty-one years, during which time there have been many rule changes, to modify or eliminate Fed.R.Bankr.P. Rule 4003(c). It has not done so. Additionally, the Supreme Court in Raleigh stated that the burden of proof has long been considered "substantive" ---citing pre-World War II cases in support of the proposition. Those cases long predate Fed.R.Bankr.P. Rule 4003(c), yet the Supreme Court approved the rule despite the presence of those cases. Given these observations and the ambiguity regarding the continuing validity of Fed.R.Bankr.P. Rule 4003(c), this Court would be remiss to invalidate an existing rule of bankruptcy procedure on the basis that it may violate Raleigh. This is especially so when, to this Court's knowledge, every circuit court that has cited the burden of proof for an objection to a homestead exemption has continued to refer to Fed.R.Bankr.P. Rule 4003(c) even after Raleigh.
>
> Rather, this Court agrees with the analysis set forth in In re Weatherspoon, 605

---

[8] It should be noted here that Debtor did indeed record a declared homestead in 2001 which can be seen on the records of the Riverside County Recorder's Office. See attached Declaration of Benjamin Heston. However, this is immaterial given that the FRBP are controlling over the C.C.P.

B.R. 472, 482 (Bankr. S.D. Ohio 2019):

Although <u>Raleigh</u> was decided in the context of an objection to a proof of claim and did not involve Bankruptcy Rule 4003(c), some bankruptcy courts have questioned the continued viability of the rule in light of the Supreme Court's holding in that case. These cases are well-reasoned, and Ohio courts place the burden of proof on the party claiming the exemption. Thus, it could be argued that here the Debtor should shoulder the burden of proving the exemption was properly claimed. But even if decisions such as <u>Tallerico</u> are correctly decided, it is not for this Court to determine that <u>Raleigh</u> overruled <u>Zingale</u> by implication; instead, it must follow <u>Zingale</u> until the Supreme Court or the Sixth Circuit overrules it.

If trial courts disregard binding precedent and binding legal provisions on the basis that they have been implicitly overruled, especially when there are legitimate arguments to the contrary, judicial hierarchy and the entire doctrine of legal precedent would be undermined. As such, the Court finds Trustee has the burden of proof in objecting to Debtor's homestead exemption.

<u>In re Hammond</u>, 6:17-bk-18617-MH, at *10-11 (Bankr. C.D. Cal. Mar. 16, 2022) (footnote omitted where court states disagreement with various cases cited to by trustee).

Accordingly, Respondent bears the burden to show that Debtor's exemption is not valid. For the reasons set forth above, this burden has clearly not been met.

## IV.

## THE EVIDENCE IN SUPPORT OF DEBTOR'S VALUATION SHOULD BE GIVEN SUBSTANTIAL WEIGHT OVER THE EVIDENCE PRODUCED BY RESPONDENT

Respondent has submitted two (or arguably one) pieces of evidence in support of their valuation: 1) an appraisal conducted by Anthony Whitmarsh (the "Whitmarsh Appraisal"); and 2) some offhand comments and critiques by Holly Walker, Counsel for Respondent. On the first of these, the Dunn Appraisal is more accurate and based on a greater degree of first-hand knowledge of the Subject Property and a more in-depth analysis of the immediate market conditions. On the second, Ms. Walker is not an appraiser and has not shown that her comments should be taken as those of an expert witness.

In support of Debtor's valuation, the Debtor has submitted the appraisal conducted by Dianna Dunn (the "Dunn Appraisal"), as well as a lengthy critique and comparative analysis of

the two appraisals (the "Dunn Declaration"). To add some brevity to the Dunn's Declaration, below are a few of the major points addressed:

- **Age of Property and Deferred Maintenance**

  Subject Property has not been upgraded and is still has its "1970s interior". Although the Dunn Appraisal notes some deferred maintenance, no adjustment was applied since the cost to repair would be insignificant.

- **View, Location, and Street Access**

  Subject Property is located directly adjacent to a main thoroughfare which causes significant noise issues. The Subject Property's street, Corsica Avenue, is a private road in very poor condition for which Debtor and her spouse are responsible for maintaining along with their neighbor.

- **Whitmarsh Appraisal**

  The Whitmarsh Appraisal is in a commercial appraisal format and contains a significant amount of "fluff", including very general statistics and graphs which primarily refer to the greater region, and not the specific site of the Subject Property.

- **Whitmarsh Appraisal – Approaches to Valuation**

  Based on Ms. Dunn's review of the Whitmarsh Appraisal, it does not appear that he performed a cost approach or income capitalization analysis. In the Opposition, Ms. Walker misstates that the Dunn Appraisal does not contain these same valuation analyses.

- **Location Relative to Washington Street**

  The Opposition misstates the Dunn Appraisal's analysis of the location relative to the main thoroughfare and the street improvements/infrastructure.

- **Deferred Maintenance**

  The Opposition misstates that that the Dunn Appraisal indicated that the Subject Property is in need of TLC, yet did not include a list of repairs. The Dunn Appraisal only notes the minimal deferred maintenance with an estimated cost of repair of $1,500 for which no adjustment was made.

- **Whitmarsh Appraisal – Sale Date and Location of Comp #4**

  The Whitmarsh Appraisal, Comp #4 closed escrow after the effective date of the appraisal and should not have been used as a comparable. Comp #4 is located on the opposition side of the main thoroughfare where property values are approximately 5% higher than properties located on the same side as the Subject Property.[9]

- **Whitmarsh Appraisal – Age of Comps #1, #2**

  These Comps were built in 2007 and 2003 respectively, whereas the Subject Property was built in 1978. Additionally, the sale date of these Comps was more than 6 months from the effective date, which renders them less useful in determining Subject Property's value than the abundant sales that were within that 6-month period.

- **Adjustments for View**

  The Whitmarsh Appraisal considers all of the Comps to have similar views as the Subject Property. However, these views are much different than that of the Subject Property.

- **Whitmarsh Appraisal – Age and Upgrades of Comps**

  There are considerable differences between the Comps and the Subject Property which little or no consideration was given in the Whitmarsh Appraisal. These include the age of the properties, number and configuration of garages, infrastructure maintenance and improvements, views, traffic noise, and interior ages and upgrades.

- **Whitmarsh & Dunn Appraisal – Shared Comp**

  Whitmarsh Comp #3 was also utilized in the Dunn Appraisal, however, it is located in a superior location with superior infrastructure and improvements for which the Whitmarsh does not give any consideration to.

- **Whitmarsh Appraisal – Comps #1, #2, #3**

  The superior location of these Comps as well as the infrastructure and improvements were not given proper consideration in the Whitmarsh Appraisal. Further, the Whitmarsh

---

[9] Although not explicitly stated the Dunn Declaration, a 5% increase in value could account for roughly $40,000 of inflated value of the Whitmarsh Appraisal.

Appraisal makes adjustments across the board for increasing market at the time of inspection. The market analysis in the Dunn Appraisal is based on very reliable and industry standard sources which shows that the market was stable during the periods of inspection.

- **Dunn Appraisal – Similarity of All Comps to Subject Property**

  All six comps used in the Dunn Appraisal are age appropriate and given proper adjustments for lot size, location, infrastructure, view, size, condition, and garage county. The Dunn Declaration also goes into a short summary of how she used the comps in order to arrive at a valuation of the Subject Property.

## CONCLUSION

For the reasons stated above, it is respectfully requested that the Court order as follows:

1. The Debtor's homestead exemption is $580,000 and final;

2. The value of Debtor's residence is $760,000;

3. There does not exist any non-exempt equity in the Property;

4. The lien is avoided in its entirety.

HESTON & HESTON,
Attorneys at Law

Date: July 19, 2022

BENJAMIN HESTON,
Attorney for Debtor

## DECLARATION OF BENJAMIN HESTON

I, Benjamin Heston, declare as follows:

1. I am the attorney for the Debtor in the instant Chapter 7 bankruptcy proceeding. I have personal knowledge of all facts stated herein. As to those facts which are based on my knowledge and belief, I believe those facts to be true. I could competently testify to the facts stated herein.

2. On April 30, 2022, I sent an email to Holly Walker, Counsel for Respondent, which stated: "We plan on filing the motion to avoid lien asap, possibly Monday." Thereafter, we delayed the filing of the Motion in order to allow Respondent to conduct their own appraisal of the Property.

3. On July 17, 2022, I reviewed the records of the Riverside County Recorder through their online portal at https://webselfservice.riversideacr.com. Attached hereto as Exhibit B is a true and correct copy of the index page for the homestead declaration that Debtor and her spouse recorded on June 7, 2001.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: July 19, 2022

BENJAMIN HESTON

# EXHIBIT A

## **DECLARATION OF DIANNA DUNN**

I, Dianna Dunn, declare as follows:

I have personal knowledge of all facts stated herein. As to those facts which are based on my knowledge, expertise, and belief, I believe those facts to be true. I could competently testify to the facts stated herein.

## **My Background**

I am a certified residential appraiser licensed through the California Bureau of Real Estate Appraisers. I first became licensed in 1994, with license # AR 023017. My license permits me to value residential properties of 1-4 units, which does not include commercial properties.

I am active as an independent fee appraiser and perform an average of 225-300 appraisals per year for litigation, estate, divorce, tax purposes, as well as Conventional and FHA lending purposes. Although I primarily work in Riverside, I have geographical competency in Riverside, San Bernardino, Orange, San Diego, and Los Angeles counties.

I was employed with "Pacific Appraisals" in 2005 and then purchased the company in October 2006. While acting as the owner and operator of Pacific Appraisals, I managed 12-20 appraisers throughout Southern, Central, and Northern California.

I also presently hold a seat with the County of Riverside Tax Assessment Appeals Board and since September 2015 I have been hearing tax appeal cases and

rendering decisions along with my fellow board members for residential and commercial properties located throughout the county of Riverside.

**Dunn Appraisal - Summary**

On March 11, 2022, I conducted an on-site appraisal of the property located at 15310 Corsica Avenue, Riverside, California, 92504 ("Subject Property"). My inspection involved a thorough inspection of the Subject Property and the surrounding area. I later used this information, along with market data and recent comparable sales to perform an analysis of the Subject Property's fair market value as set forth in my appraisal ("Dunn Appraisal").

**Age of Property and Deferred Maintenance**

Subject Property is a single-family residence built in 1978 consisting of 3,256 sq ft (measured) with four bedrooms and three bathrooms. Subject Property is well maintained; however, it has its original 1970s interior and has not received any upgrades. Subject Property has some minor deferred maintenance as explained within my report consisting of various areas of ceiling need paint from prior ceiling leaks, and the window at stairwell has had prior leakage at the windowsill, all stains are in need of paint, estimated cost to cure approximately $1,500. This estimated cost to cure was not applied as an adjustment on any of the sale comparables as it is too insignificant and has no effect on value.

**View, Location, and Street Access**

The Subject Property sits on a 1.07-acre lot with an unobstructed view of city lights and mountains. Subject Property's lot does connect to Washington Street (at the northeast corner of the lot), which is a busy thoroughfare and causes significant traffic noise associated with the location, regardless of the structure's elevation of

approximately 35-40 feet above the street. There is no noise barrier and the traffic

noise that can be heard from the Subject Property is significant, which I personally

observed while performing the physical inspection. Although the Subject Property

does side to Washington Street, access to the lot is obtained via a side street

identified as Bellino Way, which is a partially asphalt paved and partially gravel

street. Bellino Way is a gravel street at Subject Property's private road entrance.

Subject Property's street, "Corsica Avenue," is actually a private road that two

residences share (Subject Property and the lower located property addressed as

15330 Corsica Ave). The two residences share responsibility for road maintenance.

The lower portion of the road appears to be accessed via an easement over 15330

Corsica Ave. The private road is in need of some maintenance as the asphalt is

cracking and wearing.


**<u>Whitmarsh Appraisal</u>**

I was provided a copy of the Opposition, Mr. Whitmarsh's appraisal

("Whitmarsh Appraisal"), and Ms. Walker's comments on the two appraisals. I have

thoroughly reviewed these documents.


The Opposition contends that the Whitmarsh Appraisal is more in-depth and

comprehensive than mine. However, the Whitmarsh Appraisal is in the format of

what is typically used for commercial properties. It is largely comprised of excessive

housing data which is unusual for a residential appraisal (i.e., required in everyday

loan purposes for FreddieMac/FannieMae and FHA). It contains an excessive

amount of statistical and graphical data. Not knowing the parameters utilized for

said data samples, I cannot attest to the accuracy of the data provided. However, my

experience is that most data is extracted from a larger area (regional) market area,

and thus not as micro-focused when analyzing a subject property's immediate

market area.

**<u>Whitmarsh Appraisal – Approaches to Valuations</u>**

The Opposition contends that the Whitmarsh is supported by a summary of

salient facts and conclusions, a definition of market value, regional analysis,

improvement analysis, highest and best use commentary, cost approach analysis and

income capitalization approach and a final reconciliation. However, it does not

appear that Mr. Whitmarsh performed a cost approach analysis or an income

capitalization approach, however it has included a lot of pages of information for

explanation to the approaches to value mentioned. (See his page 113 Analysis and

Final Reconciliation).

The Opposition states that my appraisal did not address the same analyses as

described above. This is incorrect. My appraisal addresses the entire scope of work as

required by USPAP in the addendum, as well as highest and best use commentary,

etc. (See Dunn Appraisal, "Supplemental Addendum" pages 7-10).

Further, the Opposition contends that my adjustments for living area appear

to be conservative. While this might be a matter of opinion subject to reasonable

dispute, my adjustments have been extracted via paired sales analysis as explained

within the report, and analyzing this market within the delineated market area I am

working within in order to gain a full and true grasp of values within the market

without influence of excessive or left field data.

**Location Relative to Washington Street**

The Opposition states that my report has "adjusted for subject having frontage along a busy road when the site is elevated and ingress/egress is not direct to this road from the subject site". This is incorrect. My report is not adjusting for frontage to Washington Street. To the contrary, my report has adjusted for location siding the street and the external obsolescence associated with the traffic noise factors. My appraisal adjusts for superior locations of comparables with superior street improvements and infrastructure, (i.e., curbs, gutters, street lights, asphalt paving).

**Deferred Maintenance**

The Opposition further states that my appraisal indicates that the Subject Property is in need of "TLC," and did not provide a list of items in need of repair and the cost to repair as related to the comparable sales. Again, this is incorrect. My appraisal does not contain any such comment to indicate the Subject Property needing TLC. If this language in the Opposition refers to my comments regarding deferred maintenance, the only item which I specifically noted in this regard was the leaky windowsill and ceiling stains as described within my report and above with an estimated cost to repair of $1,500 which, as stated earlier, was not factored into the final result as this cost was insignificant.

**Whitmarsh Appraisal – Sale Date and Location of Comp #4**

Mr. Whitmarsh utilized four comparable sales ("comps") in his analysis, with Comp #4 as his highest sale price. First, Comp #4 closed escrow on May 6, 2020, which is *after the* effective date of his appraisal. For this reason, this sale simply cannot be used as an indicator of value since it is based on facts that did not exist as of the effective date.



The properties found on the east side of Washington street had sales prices ranging from $650,000 to $1,300,000 with the median sale price of $920,000. Properties located on the west side of Washington Street sale prices range from $549,999 to $898,000 with the median sale price of $802,250. This 5% difference indicates that properties on the east side of Washington Street carry higher values than properties located on the west side where the Subject Property is located.

**Whitmarsh Appraisal - Age of Comps #1, #2**

The Whitmarsh Appraisal comparables 1 and 2, built in 2007 and 2003, respectively, are considerably newer in age to the Subject Property. Additionally, both comparables are dated sales beyond six months from the effective date and should not have been utilized. This is especially so given that there were plenty of sales in the area which are age-appropriate and are better comparable indicators of value.

**Adjustments for View**

The Whitmarsh Appraisal considers all his comparables to have similar views to Subject Property, which is very inaccurate. Comparable 1 is a single-level with a

view lot, however the fence line of comparable 1's view is completely obstructed with shrubbery preventing an unobstructed view and only allowing for a distant hills view. It is located in a superior location with superior street infrastructure and improvements with no traffic noise issues.

Comparable 2, MLS describes no view, however it does have a neutral pastoral view from the rear. Comparable 3 has a similar view to the Subject Property as it is located on an elevated lot facing the same easterly direction from it's cul-de-sac location. Comparable 4, MLS describes peek-a-boo view with no further clairification, at best the MLS photos display a pastoral view of it's own lot.

## **Whitmarsh Appraisal – Age and Upgrades of Comps**

Comparable 1 is superior with modern custom cabinets and ceramic tiled countertops in kitchen, verses Subject's laminate countertops, 1970's cabinets and original electric appliances as well as original ceramic tiled bathrooms. Mr. Whitmarsh has adjusted this comparable as superior in upgrades or remodeling at 2.5% or $20,731. This comparable is indicated to have 6 garages, however reading the MLS indicates it is indicated to have a 3 car attached garage and a detached RV garage with workshop as well as an additional 2 car garage with workshop. This property is also located on a street with superior infrastructure and improvements than that of Subject, with no traffic noise issues, to which no consideration is given.

Comparable 2 is a single level and has no view. It is located in a superior location with superior street infrastructure and improvements with no traffic noise issues, no consideration given. This property is far superior with modern cabinets, granite countertops in kitchen and bathrooms and a completely marble tiled master bath, verses Subject's laminate countertops, 1970's cabinets and original electric

appliances and original ceramic tiled bathrooms, Mr. Whitmarsh considers it similar in condition and upgrades.

**Whitmarsh & Dunn Appraisal – Shared Comp**

Comparable 3 is the only comparable sale we share and was a sale pending closure at the time of my appraisal as-of the effective date. This property has the most similar view to Subject. It is also the most similar in location to Subject, as although it too is located off of Washington Street, it still has the same noise issues from the traffic flow on this street. It is located in a superior location with superior street infrastructure and improvements. The Whitmarsh Appraisal does not consider location a factor for Subject nor the comparable sales utilized in his report.

**Whitmarsh Appraisal – Comps #1, #2, #3**

Comparables 1, 2 and 3 are all located on superior improved streets and infrastructure than Subject, with no consideration having been given Subject's adverse location (noise from traffic). Additionally, Mr. Whitmarsh has adjusted Comps 1, 2 and 3 for an increasing market at the time of inspection. This created upward adjustments across the board which tends to inflate value. My analysis of the market finds that the market within my delineated boundaries to be stable for properties of this age and size range at the time of inspection based on market analysis obtained via Corelogic data and 1004MC data, which are sources of data that are commonly used in the appraisal industry for loan purposes.

**Dunn Appraisal – Similarity of All Comps to Subject Property**

Ms. Dunn's appraisal includes six comparables all within the six month time frame requiring no market adjustments. All six comparables are age appropriate and

have only been adjusted for lot size, adverse location or superior infrastructure locations, view, size, condition, and garage count differences.

Greatest weight is given comparable 1 as most like subject in gross living area, lot size and pool/spa amenities as well as location and condition adjusting at $748,000. Secondary weight is given comparable 3 as most similar in view, providing adequate bracketing, adjusting at $743,400. With remaining weight given comparables 2, 4 and 5 adjusting at $796,500, 720,100 and $882,700 respectively, reconciling at $760,000, which is more in line with the median sales price of comparable properties on the west side of Washington Street of $724,999.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:  July 17, 2022

DIANNA DUNN,
Certified Residential Appraiser

9

# EXHIBIT B

# Self-Service: Document Search

🌐 **webselfservice.riversideacr.com**/Web/search/DOCSEARCH2111S2

- Document Number Search - Web
- Enter the **Document Number** as a four digit year a dash and then the number (i.e. 2000-000001).  You will need to use leading zeros, if necessary, to make the required number of digits.

  **Please note**: Our document numbers started out as 6 digits and then went to 7 on 12/23/2003.

- Recorder Documents are indexed from Jan 1, 1974 through Jul 15, 2022
- Clerk Documents are indexed from Jan 1, 1893 through Jul 8, 2022

- Recent searchesSearchClear Selections

## Description (1)

HOMESTEAD 1

## Name (2)

MEINBERG DONALD WALTER 1 MEINBERG LINDA KAY 1
Apply Filter(s)

- Showing page 1 of 1 for 1 Total Results

  Document Number Search - Web Document Number equals 2001-253215

- 

## 2001-253215 • HOMESTEAD

Visited

- Recording Date
- **06/07/2001 08:00 AM**
- Grantor (2)
- **MEINBERG DONALD WALTER**
- **MEINBERG LINDA KAY**
  Grantee
- # of Pages
- **2**

## Related Documents

No Related Documents
View

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

19700 Fairchild Road, Suite 280
Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*):  **REPLY TO OPPOSITION TO DEBTOR'S MOTION TO AVOID LIEN** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 7/19/2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **United States Trustee (RS)**    ustpregion16.rs.ecf@usdoj.gov
- **Holly Walker**    holly@veruslawgroup.com
- **Robert Whitmore (TR)**    rswtrustee@yahoo.com, rwhitmore@ecf.axosfs.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 7/19/2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**JUDGE**
Hon. Wayne Johnson
United States Bankruptcy Court
Central District of California
3420 Twelfth Street, Suite 384 / Courtroom 304
Riverside, CA 92501-3819

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/19/2022 | Yanira Flores | /s/ Yanira Flores |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.